UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
)
v. )  Cr. No. 17-064-JJM-LDA
)
ANTHONY MONDREZ THOMPSON, )
Defendant. )
)

MEMORANDUM & ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Anthony Mondrez Thompson has moved to suppress evidence seized following a traffic stop and search by the Rhode Island State Police. ECF No. 24. Because the police did not measurably prolong the stop in violation of *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and because Mr. Thompson's other arguments do not require excluding the evidence seized, the Court DENIES the Defendants' Motion to Suppress.

I. BACKGROUND

Mr. Thompson was driving north on I-95 from North Carolina to Providence. Tr. 160:5–161:8.[1] At about 7:45 p.m., between exits five and six, Rhode Island State Police Trooper Garrett Hassett observed Mr. Thompson's Nissan Pathfinder twice veer several inches over the fog line into the breakdown lane. *Id.* at 13:12–14:1,

---

[1] The Court recites the relevant, credible facts as taken from the evidentiary hearing. While both Mr. Thompson and Trooper Hassett presented as credible witnesses, the Court states the facts as it found them to be true after hearing all the testimony and reviewing all the evidence. All citations to "Tr." refer to the transcript of the evidentiary hearing, docketed at ECF No. 35.

56:18–21, 83:16–18. At 7:50 p.m., Trooper Hassett ran a registry inquiry on the vehicle's license plate to check the vehicle's information. *Id.* at 14:9–13; Gov't Ex. 3. Suspecting the driver may be impaired, Trooper Hassett then pulled over the vehicle.[2] *Id.* at 4:9-19; 14:17-19; 22:17-20.

Trooper Hassett approached the car and spoke with Mr. Thompson. He asked for Mr. Thompson's license and registration; asked if Mr. Thompson knew why the trooper had pulled him over; and asked if he had been drinking. *Id.* at 22:15–20; 166:1–5. Mr. Thompson said he had not been drinking and that he had been driving for thirteen hours, showing Trooper Hassett a plastic bag with empty energy drinks. *Id.* at 22:21–23:2; 166:13–18. Trooper Hassett asked Mr. Thompson where he was coming from and where he was going; Mr. Thompson stated he was coming from North Carolina to go to a family function in Providence. *Id.* at 23:2–4; 166:6–12.

Trooper Hassett then asked whether Mr. Thompson had ever been arrested before. *Id.* at 166:19–20. Mr. Thompson replied, "What does that have to do with a traffic stop?" *Id.* at 166:21–22. Trooper Hassett instructed, "Just answer the question." *Id.* at 166:22–23. At that point, Mr. Thompson replied, "No." *Id.* at 166:23; *see id.* at 167:19–168:3. Mr. Thompson testified that his "No" was a refusal to answer the question—not a statement that he had no criminal history. *Id.* at 168:4–9. Trooper Hassett interpreted the "No" as a statement that Mr. Thompson had no

---

[2] Also present at the scene was Trooper Jeffrey Konieczny. Gov't Ex. 1 at 1. Although there is some disagreement in the testimony about where Trooper Konieczny was located, *compare, e.g.,* Tr. 19:21–25 (testimony that Trooper Konieczny arrived once stop was already in progress), *with id.* at 165:22–25 (testimony that Troopers Hassett and Konieczny approached the car simultaneously), those details are ultimately irrelevant for this motion.

criminal history. *Id.* at 23:5-6. Trooper Hassett then asked if Mr. Thompson had any firearms or contraband in the car, which Mr. Thompson denied. *Id.* at 23:6–9; 168:10–15.

At this point, Trooper Hassett was satisfied that Mr. Thompson was not operating under the influence of alcohol. *Id.* at 94:3–6, 128:16–129:4. Although Mr. Thompson could have been operating under the influence of some other substance, Trooper Hassett decided not to investigate along those lines. *Id.* at 94:7–16. However, Trooper Hassett had not yet decided whether he was going to issue a ticket to Mr. Thompson for the observed lane violation. *Id.* at 92:16–93:15.

Trooper Hassett returned to his car and ran two checks on the operator. *Id.* at 29:12–17. First, at 7:54 p.m., he ran Mr. Thompson's driver's license and registration. *Id.* at 31:6–15; Gov't Ex. 3. The check told Trooper Hassett that Mr. Thompson's license was active and that he had no warrants. *Id.* at 31:23–32:7. The second check, run a minute later at 7:55 p.m., was a criminal background check through the National Criminal Information Center database. *Id.* at 32:16–25; Gov't Ex. 3. This check yielded an extensive but dated criminal background for Mr. Thompson.[3] *Id.* at 33:1–2; *see* Gov't Ex. 4. Trooper Hassett briefly reviewed the history for a minute or two, admittedly not in depth, before returning to Mr. Thompson's car. *Id.* at 33:5–10; *see id.* at 81:16–21 (recognizing length, but not age, of criminal history).

---

[3] Mr. Thompson criminal history sheet is nineteen pages long. Gov't Ex. 4. It includes "numerous weapons charges, other violent crimes such as attempted murder, kidnapping, and other narcotic delivery charges as well." *Id.* at 37:18-20.

3

Concerned that Mr. Thompson had lied to him about his criminal history, Trooper Hassett returned to the Pathfinder and asked Mr. Thompson to exit the car.[4] *Id.* at 40:25–41:12; 172:15. Mr. Thompson at first protested, asking why he needed to step out of the car; after some thirty seconds, he relented and exited the car. *Id.* at 41:9–23; 172:24–173:14.[5]

Trooper Hassett escorted Mr. Thompson to the rear of his vehicle and asked him why he lied about his criminal history. *Id.* at 42:10–22; 174:18–21. Mr. Thompson stated that he did not lie and that his record was old, and asked how this related to the traffic stop; Trooper Hassett again questioned him about why he concealed his past. *Id.* at 42:20–25, 174:22–24, 179:21–24. Mr. Thompson began to grow "agitated" and "started flailing his arms around." *Id.* at 43:3-11. Mr. Thompson responded that he was a business owner, had a nonprofit, and was a husband and father. *Id.* at 174:24–175:1. Trooper Hassett then pressed Mr. Thompson a third time about why he lied; Mr. Thompson gave him the same response. *Id.* at 175:1–3, 174:4–13.

---

[4] Mr. Thompson testified that the trooper asked, "Listen, am I being given a ticket?" to which Trooper Hassett responded, "No." Tr. 172:24–25. Trooper Hassett testified that he never told Mr. Thompson he was not issuing a ticket. *Id.* at 72:10–13. The Court found Trooper Hassett's testimony more credible on this point.

[5] Up until this point, Mr. Thompson had been on the phone with Ms. Akabra Hodge, a friend he was going to visit in Rhode Island. Ms. Hodge testified that she heard an officer ask Mr. Thompson for his license and registration, if he had any weapons in the car, if he had any outstanding warrants, and that Mr. Thompson wanted to know why the trooper had pulled him over. Tr. 151:20–152:3, 152:24–153:4, 154:3–8. She also remembers the officer ordering Mr. Thompson to hang up the phone. *Id.* at 151:18, 151:25–152:2.

4

Trooper Hassett then asked Mr. Thompson what he had in his trunk, and asked to search it. *Id.* at 175:10–12. Mr. Thompson stated that he only had luggage and clothes. *Id.* Trooper Hassett informed Mr. Thompson that he would not allow him to leave until he consented to a search. *Id.* at 175:12–14. Mr. Thompson opened his trunk. *Id.* at 175:15. The search did not yield anything except clothing and sneakers. *Id.* at 175:16–19.

Trooper Hassett was not satisfied and told Mr. Thompson that he believed he was hiding something. *Id.* at 175:20–21. Trooper Hassett then asked Mr. Thompson if he had anything inside the vehicle, intending to inquire into contraband. *Id.* at 44:22–45:7. Mr. Thompson replied that he had no contraband in the vehicle, and that he had his business papers in the glove compartment. *Id.* at 45:7–10. Trooper Hassett then asked for consent to search the vehicle; Mr. Thompson, however, consented only to a search of the glove box. *Id.* at 45:11–14

Trooper Hassett left Mr. Thompson at the rear of the car with Trooper Konieczny watching him. *Id.* at 46:23-24; 176:8-9. As Trooper Hassett began to open the passenger door to conduct the consensual search of the glove box, Mr. Thompson began to back up. *Id.* at 176:20–23. Trooper Konieczny instructed Mr. Thompson not to move. *Id.* at 176:23–24. Mr. Thompson raised his hands and began to back up before turning and running away from the troopers and onto the highway. *Id.* at

176:24–177:2. Trooper Hassett pursued Mr. Thompson, tased him, and brought him back to the side of the highway. *Id.* at 177:11–18.[6]

With Mr. Thompson now detained and under the supervision of West Greenwich police, who had responded to the scene, Trooper Hassett began to search the vehicle. *Id.* at 64:18–20. He looked down and saw two Gucci bags on the front seat. *Id.* at 47:19-22. Trooper Hassett saw a flashlight sitting on top of one of the bags designed to attach to the rail of a pistol. *Id.* at 49:16-18. He secured the flashlight and became concerned that there might be a weapon in the vehicle. *Id.* at 52:19–53:3. He discovered a loaded Glock pistol under the front passenger seat. *Id.* at 64:20–65:6. Then, Trooper Hassett found a black backpack on the rear middle bench seat, which contained camouflage gear, night-vision goggles, a machete, handcuffs, pepper spray, a taser, a garbage bag, and a pistol holster. *Id.* at 65:7–16. Because it was getting dark, the police had the car towed back to the police barracks. *Id.* at 65:20–66:4. Later an inventory search of Mr. Thompson's car revealed about a dozen firearms, hundreds of rounds of ammunition, smoke grenades, and drugs, including marijuana and ecstasy. *Id.* at 66:5–13; *see* Gov't Ex. 1.

---

[6] Mr. Thompson also alleges that the troopers hit him with a blunt object repeatedly, including on the arm and head, and that one of the troopers put his foot on his neck and pushed his face into the ground. *Id.* at 177:15–178:4. Mr. Thompson lost several front teeth and sustained significant injury to his left arm. *Id.* at 181:22–183:2. His arm required five surgeries to repair, and doctors had discussed amputation as a possibility. *Id.* at 183:3–18. The Court makes no finding about whether these injuries occurred at the hands of the police, or whether he sustained them by falling, as Trooper Hassett's testimony suggests (*see id.* at 61:2–18), as this issue is ultimately outside the scope of the suppression hearing.

Mr. Thompson was indicted for three felonies: one count of being a felon in possession of firearms, one count of possession with intent to distribute 3,4-methylenedioxymethamphetamine (ecstasy), and one count of possession of a firearm in furtherance of drug trafficking. ECF No. 4. Mr. Thompson moved to suppress the evidence uncovered during, and because of, the traffic stop. ECF No. 24. The Court held an evidentiary hearing, and then counsel argued the motion at two additional hearings.

II. ANALYSIS

The Court's analysis turns on four distinct issues: First, whether the original stop was lawful; second, whether the law allowed Trooper Hassett to inquire into, and conduct a database search on Mr. Thompson's criminal history; third, whether Trooper Hassett had reasonable suspicion to continue the traffic stop; and fourth, whether Trooper Hassett had probable cause to search the car. The Court addresses each issue in turn.

A. The original stop was lawful.

The Court's analysis begins with the propriety of the initial traffic stop. Whether that initial stop was lawful depends on whether there was probable cause that a traffic violation occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). Here, the answer comes down to a pure credibility determination: Trooper Hassett testified that he observed Mr. Thompson twice veer across the fog line; Mr. Thompson asserts that he did not. The Court here credits Trooper Hassett's version of events.

Mr. Thompson himself testified that he had been driving for thirteen hours, that he had stopped many times, had taken a nap, and had consumed energy drinks.

7

Tr. 22:21-23, 160:5–15, 166:13–18. Mr. Thompson also testified that he was on the phone when the trooper pulled him over. *Id.* at 163:14–16. Mr. Thompson acknowledged that Trooper Hassett followed him for "a little bit" before pulling him over (*id.* at 161:25–162:1, 162:24–163:13); this time would allow Trooper Hassett to witness a lane violation to the car's right, as opposed from the more implausible possibility of detecting a fog line violation from the patrol car's position on the highway's median. Taken together, the Court finds it most plausible that Mr. Thompson veered across the white fog line, and that Trooper Hassett witnessed this.[7]

Traffic stops based on probable cause to believe that the driver has committed a traffic infraction are reasonable. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam). Because Trooper Hassett observed a lane roadway violation as described in Rhode Island General Laws § 31-15-11, he had probable cause to pull over Mr. Thompson.[8] *See* Gov't Ex. 9. Thus, the initial stop was lawful.

> B. Trooper Hassett's initial inquiry and database search for Mr. Thompson's criminal background were permissible and did not unreasonably prolong the seizure

The next point of analysis turns on whether Trooper Hassett could ask about, and search a records database for Mr. Thompson's criminal record. "A routine traffic stop ... is a relatively brief encounter" analogous to a "*Terry* stop." *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *see Terry v. Ohio*, 392 U.S. 1 (1968). "Like a *Terry* stop, the

---

[7] Mr. Thompson testified he had lane departure warnings and that they did not go off. The Court did not find this testimony credible.

[8] The observed lane violation also raised concerns for Trooper Hassett that the driver of the vehicle was impaired. Tr. 14:17–19.

8

tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A seizure therefore is no longer lawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

The *Rodriguez* Court was careful to note that the "mission" of the seizure includes not only resolving the traffic violation, but also ensuring officer safety. *Id.* The Court also noted "the government's officer safety interest stems from the mission of the stop itself," and "so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 1616.

The "mission" of this traffic stop was to find out if Mr. Thompson had committed a moving vehicle violation or was driving impaired. While the trooper concluded that Mr. Thompson was not intoxicated before he left the vehicle to conduct the background checks, he had not yet determined whether to issue a ticket for the moving vehicle violation. Tr. 92:16-93:15.

Trooper Hassett also had a legitimate concern for his own safety. Traffic stops are "especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citing *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). Trooper Hassett's narrow questioning about Mr. Thompson's arrest history and the presence of contraband in the vehicle directly relate to his legitimate concerns about his safety.

This inquiry was a brief encounter, narrowly-tailored, and appropriate given the nature of traffic stops and officer safety.

This Court agrees with Chief Judge William E. Smith's analysis of the propriety of conducting background checks during an otherwise lawful traffic stop.

> Police officers may, however, conduct certain unrelated checks during an otherwise lawful traffic stop, as long as the stop is not prolonged or measurably extended.
>
> **********
>
> Even prior to *Rodriguez*, courts have recognized the distinction between a criminal background check performed as part of a "routine computer check," and a background check performed after the officer addressed the objective of the traffic stop. *See United States v. Boyce*, 351 F.3d 1102, 1106, 1107 (11th Cir. 2003) (stating that "out of interest for the officer's safety ... officers may permissibly prolong a detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation").
> While the First Circuit has not confronted this particular issue, most courts that have addressed the question have held that police officers are permitted to conduct criminal background checks in the interest of officer safety without demonstrating additional justification under the Fourth Amendment. *See, e.g., United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is justified for officer safety"); *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001), overruled on other grounds by *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007), ("The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety."); *United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("[t]riple I checks are run largely to protect the officer" and "the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive"); *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994). And while the Seventh Circuit did not ultimately adopt this approach in a case brought 20 years ago, it acknowledged "support for the argument that requesting a criminal history check is a reasonable, constitutional part of all or most traffic stops." *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996). The court stated that it would have allowed this approach if "technology permit[ted] criminal record requests to be conducted reasonably

contemporaneously with the license and warrant checks normally solicited." *Id.*

*United States v. Sanders*, 248 F. Supp. 3d 339, 345 (D.R.I. 2017).

Trooper Hassett returned to his police car and ran two checks. Tr. at 29:12–17. First, at 7:54 p.m., he ran Mr. Thompson's driver's license and registration. *Id.* at 31:6–15; Gov't Ex. 3. The second check, run a minute later at 7:55 p.m., was a criminal background check through the National Criminal Information Center database. *Id.* at 32:16–25; Gov't Ex. 3. This check yielded an extensive but dated criminal background for Mr. Thompson. *Id.* at 33:1–2; *see* Gov't Ex. 4. Trooper Hassett briefly reviewed the history for a minute or two before returning to Mr. Thompson's car. *Id.* at 33:5–10.

"[T]he Supreme Court has characterized a criminal-record check as a "negligibly burdensome precaution" that may be necessary in order to complete the mission of the traffic stop safely." *United States v. Dion*, 859 F.3d 114, 127 n. 11 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 346 (2017) (citing *Rodriguez*, 135 S. Ct. at 1616). A review of all the facts as determined by this Court, establish that the few minutes it took to check Mr. Thompson's background did not prolong or measurably extend the stop and that the trooper's decision to run the check was proper and not violative of Mr. Thompson's rights.

> C. Trooper Hassett had sufficient reasonable suspicion to continue the seizure based on his belief that Mr. Thompson lied about his criminal history.

Once Trooper Hassett retrieved Mr. Thompson's extensive criminal history, and having determined that Mr. Thompson had lied to him about the history, it was

reasonable for the trooper to question Mr. Thompson further, including having him exit the vehicle. "[A]fter learning that the information [the driver] gave did not match records," the First Circuit held, "it was reasonable to undertake further questioning of [the passengers] to determine . . . .the reasons [the driver] might have given false information." *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009). That is precisely what happened with this stop. The United States Supreme Court emphasized that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, * * * do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. at 333 (citing *Muehler v. Mena*, 544 U.S. 93, 100-101 (2005)).

Here, the trooper suspected Mr. Thompson of lying to hide his extensive and violent criminal history. He has the right after a lawful stop, to order the driver out of the vehicle, as he did here. *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011) (citing *Maryland v. Wilson*, 519 U.S. 408, 410, 414-15 (1997)). His further inquiry of Mr. Thompson did not unreasonably prolong the traffic stop and was consistent with his concerns for officer safety and increased probable cause, because of his lying about his extensive violent criminal history that Mr. Thompson was engaged in criminal conduct.

After the stop, Mr. Thompson voluntarily agreed to allow Trooper Hassett to search his trunk.[9] No contraband was in the trunk. Trooper Hassett again asked Mr. Thompson if he had any contraband in the vehicle. Tr. 44:22–45:7. Mr. Thompson replied that he had no contraband in the vehicle. He told the troopers his business papers were in the glove compartment. *Id.* at 45:7–10. Trooper Hassett then asked for consent to search the vehicle and Mr. Thompson consented but only to a search of the glove box. *Id.* at 45:11–14.

> D. Once Mr. Thompson ran, the troopers had probable cause to search his vehicle.

As Trooper Hassett began to open the passenger door to check the glove compartment, Mr. Thompson began to back up. *Id.* at 176:20–23. Trooper Konieczny instructed Mr. Thompson not to move. *Id.* at 176:23–24. Mr. Thompson raised his hands, began to back up, and then turned and ran away, onto the highway. *Id.* at 176:24–177:2. The troopers chased Mr. Thompson and then apprehended him after he was tased.

When an officer conducts a stop and the subject of the stop runs from the officer, officers generally pursue the individual for many safety concerns. As the Supreme Court explained in *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), "evasive behavior is a pertinent factor in determining reasonable suspicion" and "headlong flight is the consummate act of evasion." *See also Watkins v. City of Southfield*, 221 F.3d 883, 889 n.3 (6th Cir. 2000) (noting that the development of reasonable suspicion

---

[9] Even if the trunk search were illegal, it is irrelevant because the search produced no contraband and it did not lead in any way to the uncovering of any contraband.

13

may consider all events occurring before the physical apprehension of a suspect who flees).

Trooper Hassett then conducted the search of the car. First, he saw the bags on the seat in plain sight containing a flashlight that would attach to a pistol. Tr. 49:16-18. He secured the flashlight. *Id.* at 52:19–53:3. He became reasonably concerned that there might be a weapon in the vehicle. *Id.* He found the loaded Glock pistol under the passenger's seat.

A further search of the vehicle after police towed it and it was in the custody of the police, uncovered a dozen firearms, hundreds of rounds of ammunition, smoke grenades, and drugs, including marijuana and ecstasy. *Id.* at 66:5–13; *see* Gov't Ex. 1.

Trooper Hassett's consensual search of the glove box led to a plain sight viewing of a weapon apparatus, leading him to probable cause to search the remainder of the car. The inventory search once the police towed and impounded the car was also constitutionally permissible. *Colorado v. Bertine*, 479 U.S. 367, 372, (1987) ("inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. In light of these strong governmental interests and the diminished expectation of privacy in an automobile, we upheld the search. In reaching this decision, we observed that our cases accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody.") (citing *Cooper v. California*, 386 U.S. 58, 61–62 (1967); *Harris*

*v. United States*, 390 U.S. 234, 236 (1968); *Cady v. Dombrowski*, 413 U.S. 433, 447–448 (1973).

III. CONCLUSION

State police lawfully stopped Mr. Thompson. The stop was not unreasonably prolonged by the trooper's routine background computer check on Mr. Thompson. Discovering that Mr. Thompson had lied about his extensive violent criminal history, the troopers appropriately questioned him further. Once Mr. Thompson ran, the officer's search of the vehicle was appropriate. For all these reasons, the Court DENIES Mr. Thompson's Motion to Suppress. ECF No. 24.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

August 31, 2018